IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **Benjamin Kim,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| | ) | |
| **StoneX Group Inc., Global Asset Advisors LLC,** | ) | |
| **Ken Packard and Glenn Swanson, individually** | ) | **TRIAL BY JURY DEMANDED** |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff, Benajamin Kim ("Plaintiff" or "Kim"), through his counsel, Vucko Law LLP, states:

## NATURE OF PROCEEDING

This is an action under 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. §1981, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et. seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et. seq*. While Plaintiff worked as a broker for Global Asset Advisors LLC d/b/a Daniels Trading ("Global"), he was victimized and subjected to mistreatment and verbal abuse because of his race, ethnicity, and national origin. Plaintiff suffered as a major account was usurped from him, and Global knowingly permitted a then-client of Global whose account was serviced by Plaintiff until sometime in 2018 (the "Key Client"), to refer to Plaintiff as "Kim Jong-Un" (referencing Plaintiff's Korean background). Plaintiff's mistreatment included his being subjected to a non-voluntary and illegal scheme whereby defendants Global, Ken Packard ("Packard") and Glenn Swanson ("Swanson") required that Plaintiff have one or

1

more deduction(s) taken from his earnings to fund what Packard called an "error/debit reserve" which Plaintiff was told was to be designated to protect his employer(s) from perceived risk associated with the Key Client. One or more of Plaintiff's co-workers made racist and xenophobic statements, including when Plaintiff's superior, Senior Vice President Jim Burket ("Burket"), asked Plaintiff if Plaintiff was related to North Korean dictator, Kim Jong-Un. Plaintiff complained to his employers of mistreatment and wage abuses, but rather than investigating Plaintiff's Complaints, Global and StoneX retaliated against Plaintiff. In 2020, defendant StoneX Group Inc. ("StoneX") acquired Global and Plaintiff became jointly employed by StoneX and Global. Plaintiff continued to suffer discrimination, retaliation and wage abuse after StoneX began jointly employing him and continuing until his termination.

Despite being one of the top brokers for his office, the defendants held Plaintiff to stricter and less favorable trading protocols and risk control measures than similarly situated co-workers outside of his protected classes. Even after StoneX acquired Global, and despite Plaintiff's requests for payment of his withheld compensation, the Defendants continued to wrongfully withhold certain so-called "error/debit reserve" funds from Plaintiff until after his employment termination. Plaintiff was denied career opportunities that were granted to other similarly situated co-workers outside of his protected classes, and in December 2020 was ultimately terminated in yet another wrongful adverse action against Kim.

## THE PARTIES

1. Plaintiff Benjamin Kim ("Kim" or "Plaintiff") is a citizen of Illinois. Kim was employed by both StoneX and Global as an "employee" as defined by Title VII, the FLSA, and the IWPCA.

2

2. Kim worked for Global as a Senior Market Strategist from 2011 until December 14, 2020 ("Employment Period").

3. Defendant StoneX Group Inc. ("StoneX") is a Delaware corporation doing business in Illinois.

4. From July 31, 2020 until December 14, 2020, StoneX was an "employer" of Plaintiff as defined in Title VII, the ADA, the FLSA, and the IWPCA.

5. StoneX is a financial services organization that ranked No. 58 in the 2021 Fortune 500 list of the largest United States corporations by total revenue.

6. Defendant Global Asset Advisors LLC ("Global") is an Illinois limited liability company.

7. From 2011 until December 14, 2020, Global was an "employer" of Plaintiff as defined in Title VII, the FLSA, and the IWPCA.

8. Ken Packard ("Packard") was an employee of Global at all times relevant hereto. Packard is Caucasian. On information and belief, Packard is a citizen of Illinois.

9. Throughout the Employment Period, Packard worked as both hiring manager and sales manager for Global.

10. After the Acquisition, Packard worked as both hiring manager and sales manager for both Global and StoneX.

11. Packard was at all times relevant hereto an "employer" of Plaintiff as defined in the FLSA and the IWPCA.

12. Glenn Swanson ("Swanson") was an employee of Global at all times relevant hereto. Swanson is Caucasian. On information and belief, Swanson is a citizen of Illinois.

13. Swanson was President of Global and, upon information and belief, held an ownership interest in Global prior to the Acquisition.

14. Swanson was at all times relevant hereto an "employer" of Plaintiff as defined in the FLSA and the IWPCA.

15. From July 31, 2020 until at least December 14, 2020. StoneX was an employer of Swanson and Packard.

16. StoneX, Global, Swanson and Packard are collectively referred to as "Defendants" herein.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over Counts I, II, IV, V of this action pursuant to 28 U.S.C. §1331 because these claims arise under the laws of the United States. This Court has supplemental jurisdiction over Count III pursuant to 28 U.S.C. § 1367 because these claims are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This Court also has jurisdiction pursuant to 42 U.S.C. §2000(e)-(5)(f)(3) because the unlawful employment practices alleged in Plaintiff's Complaint were committed here.

18. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1) and (2) because each of the defendants does business here and/or did business here during the relevant time period and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here, and the individual defendants are believed to reside here and/or resided here throughout the Employment Period.

19. Plaintiff has exhausted his administrative remedies and his filing of this action is timely.

**BACKGROUND**

20. Plaintiff is Asian and of Korean descent.

21. In 2011, Global hired Kim as a Senior Market Strategist.

22. Packard and Swanson had hiring and firing authority for Global.

23. Throughout the Employment Period, Kim was the only Asian broker employed by Global.

24. Throughout the Employment Period, Global employed primarily Caucasian brokers who were predominantly born in the United States.

25. Throughout the Employment Period, Packard was responsible for day-to-day oversight of Global employees, including Kim.

26. Throughout the Employment Period, Swanson had authority and power to direct Kim in his work, and he exercised that power and authority and engaged in oversight of Kim with regard to his handling of the Key Client's account.

27. Until some time in 2018, one of Kim's major accounts that he serviced was that of the Key Client.

28. Swanson put such scrutiny and attention on Kim's handling of the Key Client's account that he texted Plaintiff near midnight and in another instance at 4:46 am about the Key Client's account.

29. In 2015, Packard and Swanson, as agents for Global, mandated that Kim sustain deductions from his compensation to establish an "error/debit reserve". Kim told them that if this was truly voluntary then he did not want to pay anything unless and until a liability arose for which the funds were ultimately intended. Swanson replied by telling Kim that if Kim didn't comply with the demand to establish an error/debit reserve funded with $50,000 from Plaintiff's

5

compensation, then Kim could "go work somewhere else" or Global might shut down the lucrative Key Client account.

30. Packard and Swanson informed Plaintiff that they wanted to use the Wrongful Withholdings to fund an "error/debit reserve" for perceived risk associated with the Key Client's account.

31. Packard, acting as Global's agent, urged Kim to comply with Swanson's demand for the Wrongful Withholdings.

32. Swanson, then President of Global, knowingly permitted, and indeed required, that Global make the Wrongful Withholdings.

33. Packard and Swanson both exercised control over Kim's earned wages by requiring the Wrongful Withholdings, and taking steps in furtherance of the same.

34. Starting in approximately August 2015 and continuing through January of 2016, Global periodically withheld certain amounts from Plaintiff's compensation to fund what Packard called an "error/debit reserve", ultimately totaling $50,000.00 in such withholdings (the "Wrongful Withholdings").

35. Upon information and belief, many similarly situated co-workers of Plaintiff who were Caucasian were not required to establish a special reserve in excess of $5,000.00 during the same timeframe that Plaintiff suffered the Wrongful Withholdings.

36. As sales manager, Packard typically handled communications about risk policies directly with clients, and separately with brokers. However, for Kim's handling of the Key Client's account, Swanson directly handled those communications with Kim and instructed Kim what to communicate to the Key Client.

37. In 2018, Packard shared an audio recording with Kim, and the recording was of a phone call between Packard and the Key Client (the "Client Recording").

38. On the Client Recording, Kim heard the Key Client call Plaintiff "Kim Jong-un" in the context of complaining about risk controls that Swanson required Kim to communicate about with the Key Client. Around this same time frame, Packard, Swanson and Global removed Kim from servicing the Key Client's lucrative account and instead assigned two Caucasian brokers to service the Key Client's account.

39. Even after the Key Client's account was taken from Kim, the Wrongful Withholdings were not promptly paid to Kim, and Kim complained of this to both Swanson and Packard.

40. In August of 2018, Kim met with Swanson and asked Swanson when the Wrongful Withholdings would be paid to Plaintiff. Swanson stated that the money would be paid to Kim within 2 years, which was false.

41. In 2018 Kim complained to management and asked them if there were "different risk policies associated with different brokers", as Kim observed that certain Caucasian brokers were not held to the same trading standards and risk protocols that Kim was, including with regard to the account of the Key Client.

42. Kim complained to Packard and Swanson multiple times about the Wrongful Withholdings.

43. In January of 2019, Kim emailed Packard and requested payment of a remaining $10,000 owed to him as part of the Wrongful Withholdings.

44. In January of 2019, Swanson refused to make payment to Kim of the remaining portions of the Wrongful Withholdings, and emailed Kim and Packard stating in part "We can pick

7

this up in early Feb. but my gut reaction is that I have already approved a significant release of funds in the security deposit. While [the Key Client] may be done trading both with Ben and the firm there is still the possibility that there could be liability, most likely only in the form of hiring an attorney to defend a frivolous claim that encompasses the period of time in which the account was serviced by Ben. I would agree with Ben that the core of his other business may not on its own demand the need for a security deposit but my gut reaction is to leave the $10k on deposit at the very least for the first 6 months of 2019 regardless or not of whether he trades again or not."

45. In January 2020, Plaintiff again complained to Packard and noted that over a year had transpired since Plaintiff serviced the Key Client's account, yet $10,000.00 of the Wrongful Withholdings had still never been paid to Plaintiff. Plaintiff told Packard "Since the reserve was specifically held for [the Key Client], I am requesting the release of the entire amount. Thanks."

46. Kim complained in writing to Swanson and Packard and requested payment of the Wrongful Withholdings.

47. In March of 2020, Burket made more derogatory racial comments in the workplace. For instance, Burket made derogatory comments about Asians as news tv channels covering the Coronavirus pandemic were playing in the office. Within earshot of Kim, Burket said he needed to "stay away from those Asians" because he didn't want to contract Covid-19.

48. StoneX acquired GAIN Capital Holdings, Inc. ("Gain"), including its subsidiaries which included Global, on or about July 31, 2020 (the "Acquisition").

49. On July 22, 2020 Packard texted Kim, stating in part: "One other point I wanted to share – my counterpart at StoneX is Robert Chesler. Sometime between now and the official close on July 31 you will be receiving an email from Rob welcoming you to StoneX. The point of the letter is to roll out the red carpet and officially welcome you to the brand. I have spent a lot of

time with Rob over the last two months and I can assure you that we are very similar in terms of style and perspective. Rob wants you to know the value he and StoneX places on brokers and they are excited to begin to get to know everyone and integrate as a team."

50. After acquiring Global, StoneX became directly involved in Kim's employment relationship, including without limitation by issuing him one or more paychecks.

51. After acquiring Global, StoneX had power and authority to exercise control over Kim's employment.

52. After acquiring Global, StoneX and Global jointly employed Kim.

53. StoneX issued Plaintiff a W-2 Wage and Tax Statement which identified StoneX as Plaintiff's employer.

54. After the Acquisition, Global continued to hold Kim out as its own employee.

55. During Plaintiff's Employment Period, Plaintiff was subjected to an ongoing course of mistreatment.

56. Global, Packard and Swanson subjected Kim to less favorable treatment than they did to similarly situated individuals outside of Kim's protected classes, including without limitation by subjecting Kim to more stringent standards, risk protocols and margin rules in handling customer accounts, by not providing Kim opportunities to advance his career and remain relevant in a changing field, by not providing Kim with quality customer leads, and by usurping one or more of Kim's high value account(s).

57. After usurping the Key Client account from Kim, Global, Swanson and Packard permitted Caucasian brokers to service the account, including Burket. Global, Swanson and Packard allowed these individuals to handle the Key Client account differently than Kim was allowed to handle it. Kim complained of this to no avail.

9

58. After Kim complained, Burket treated Kim differently and Kim believes it likely that Burket had been informed of Kim's complaint(s).

59. Burket outranked Kim.

60. Prior to the Acquisition, Global did not have a formal human resources department. Instead, Ken Packard and Glenn Swanson typically handled employee issues. This practice then continued after the Acquisition. Accordingly, Kim complained to them about some of the mistreatment described herein, including without limitation the usurping of Kim's Key Client account.

61. Certain Caucasian management-level employees of Global harassed Plaintiff, making derogatory comments about Asians within Plaintiff's presence, and mocked him, causing him embarrassment. Kim felt this was an attempt to intimidate Kim, after Kim had complained of certain mistreatment.

62. For example, prior to the Acquisition, Burket made a racist and xenophobic remark towards Kim in front of co-workers, in the context of seeing North Korea's Kim Jong-Un on television. Burket asked Kim if Kim was related to Kim Jong-Un and made other remarks about Plaintiff's race and ethnicity. Kim responded by asking Burkett if this was a "MeToo" situation to express Plaintiff's discomfort and make clear that this was not appropriate behavior. Kim's co-workers Scott Hoffman and Don Debartolo heard Burket's comments and spoke up to Burket in Kim's defense.

63. After Kim's Key Client account was usurped, Kim observed that one or more non-Korean Caucasian individual(s) thereafter who were handling the Key Client account were allowed to deviate from company protocols. This was a double standard that was less favorable to Kim. Kim complained to Packard and Swanson about this. Packard then verbally warned Kim that

Swanson was getting upset at Kim's emails that were highlighting protocol double-standards and deviations from established risk control measures. This discouraged Kim from making complaints of discrimination.

64. In September of 2019, Scott Hoffman ("Hoffman"), one of Kim's trading desk partners, left Global. Prior to Hoffman leaving the company, Kim and Don Debartolo ("Debartolo") would regularly cover Hoffman's book of business during Hoffman's workplace absences and at other times when he was unavailable or away from his desk. When Hoffman left the company, Packard divvied up Hoffman's book of business amongst Kim, Debartolo and Craig Turner ("Turner"). Kim observed that in this process, Turner, a similarly situated co-worker outside of Kim's protected classes, was provided much better client accounts than those that were reassigned to Kim. Kim essentially was handed the "bottom of the barrel" accounts that generated lower revenue, while both Debartolo (a Caucasian) and Turner received better accounts from Hoffman's book of business.

65. Though a number of brokers left Global during the Employment Period, Hoffman's departure was the only time Kim was offered any portion of a departing employee's book of business.

66. For a number of years during the Employment Period, Kim was one of, if not the, highest earning broker for Global on an annual basis.

67. In the Spring of 2020, Global's Vice President of Marketing, Adam, requested that Kim perform work on "small exchange" leads (the "Small Exchange Assignment"). This assignment involved working commission-free trades for a set amount of time with an aim to eventually open an account. From the perspective of a broker like Kim, this was not a lucrative

lead source but rather an unappealing assignment to perform entry-level marketing efforts for the company in exchange for limited commissions.

68. Kim believes that that Small Exchange Assignment was offered to Kim by his employers with an expectation that Kim would refuse, and then Kim's anticipated refusal would be used against him to terminate his employment.

69. Kim accepted the Small Exchange Assignment and performed work in good faith to achieve quality results.

70. In contrast, Tom Dosdall, one of Kim's similarly situated co-workers outside of Kim's protected classes, was provided with an opportunity to pivot from speculative trading clients to the more lucrative grain hedging clientele lead source(s) provided by Global. Such an opportunity was never offered to Kim.

71. On or about December 14, 2020, Global and StoneX terminated Kim's employment.

72. Plaintiff's similarly situated co-workers who did not share his Protected Characteristics enjoyed better terms and conditions of employment, including without limitation better career advancement opportunities and compensation.

73. In connection with his termination of employment, Plaintiff was told he was being "laid off".

74. Upon information and belief, no Caucasian brokers of Global who were similarly situated to Plaintiff were laid off in December of 2020.

75. Many of the brokers who were retained after Kim was laid off were less qualified and held smaller books of business that produced lower gross commissions than what was produced by Kim.

76. Global had a strong financial motive to violate the FLSA and IWPCA by causing one or more automatic deductions from his compensation for establishing an "error/debit reserve" to benefit Global.

77. Global, Packard and Swanson each had actual, and/or constructive knowledge, that Kim sustained one or more automatic deductions from his compensation for the purposes of establishing an "error/debit reserve" to benefit Global, against Kim's wishes.

**COUNT I**
**VIOLATION OF 42 U.S.C. § 2000(e) *et seq.* ("Title VII")**
**NATIONAL ORIGIN/ RACE/ COLOR DISCRIMINATION (DISPARATE TREATMENT, HARASSMENT, HOSTILE WORK ENVIRONMENT)**
**AGAINST DEFENDANTS GLOBAL AND STONEX**

78. Kim realleges and incorporates by reference Paragraphs 1 through 77 above.

79. Pursuant to Title VII, Kim is a member of a "protected class" because he is Asian and is of Korean descent.

80. Plaintiff met or exceeded Stonex's and Global's legitimate job expectations during his Employment Period.

81. StoneX and Global each took one or more adverse actions against Kim because of his national origin, race and/or ethnicity.

82. Global subjected Kim to an objectively and subjectively offensive workplace.

83. Global subjected Kim to harassment on the basis of Kim's race, ethnicity and/or national origin.

84. Global and StoneX treated similarly situated employees who were not Asian or of Korean descent more favorably than they treated Kim.

85. Global and StoneX each knew or should have known about its employees' discriminatory conduct.

86. Global and StoneX each unreasonably failed to take remedial action for its employees' discriminatory conduct.

87. StoneX's discriminatory conduct was intentional.

88. Global's discriminatory conduct was intentional.

89. StoneX's conduct was done with malice or reckless indifference to Kim's rights under federal law.

90. Global's conduct was done with malice or reckless indifference to Kim's rights under federal law.

91. Kim was damaged by discriminatory conduct of StoneX and Global in violation of Title VII. His damages include, but are not limited to, his lost wages, damage to his career, lost benefits, future pecuniary losses, inconvenience, emotional and psychological harm and other harm.

**COUNT II**
**VIOLATION OF 42 U.S.C. § 2000(e) *et seq.* ("Title VII")**
**RETALIATION (PLEADING IN THE ALTERNATIVE)**
**AGAINST DEFENDANTS GLOBAL & STONEX**

92. Kim realleges and incorporates by reference Paragraphs 1 through 77 above.

93. Pleading in the alternative, pursuant to Title VII, Kim is a member of a "protected class" because he is Asian and is of Korean descent.

94. Kim engaged in statutorily protected expression under Title VII, including by complaining to Global about discrimination.

95. Global and StoneX took one or more adverse actions against Kim because he engaged in statutorily protected expression.

96. Defendants Global and StoneX treated Kim's similarly situated coworkers who did not engage in statutorily protected activity more favorably than it treated Kim.

97. Defendants Global and StoneX knew or should have known about its employees' discriminatory conduct.

98. Defendants Global and StoneX unreasonably failed to take remedial action for its employees' discriminatory conduct.

99. Global's and StoneX's discriminatory conduct was intentional.

100. Global's and StoneX's conduct was done with malice or reckless indifference to Kim's rights under federal law.

101. Kim was damaged by Global's and StoneX's discriminatory conduct in violation of Title VII. His damages include, but are not limited to, his lost wages, damage to his career, lost benefits, future pecuniary losses, inconvenience, emotional harm and other harm.

## COUNT III
## ILLINOIS WAGE PAYMENT AND COLLECTION ACT
## (820 ILCS 115/1 *et seq.*)
## AGAINST ALL DEFENDANTS

102. Plaintiff realleges and incorporates by reference paragraphs 1-77 above.

103. Global, Packard & Swanson subjected Kim's pay to one or more automatic deductions without proper consent from Kim. In other words, Global failed to timely pay Kim his earnings due for time worked.

104. Packard & Swanson knowingly caused or permitted these violations to occur.

105. After the Acquisition, StoneX knowingly caused or permitted some of these violations to remain.

106. At all relevant times hereto, Swanson and Packard possessed day-to-day authority over Plaintiff's and other employees' terms and conditions of employment, including without limitation the authority to hire and fire, make pay decisions, and otherwise control Kim's work conditions.

107. This Court has jurisdiction over the matters alleged herein pursuant to 820 ILCS 105/12.

108. At all relevant times herein, Global, Swanson and Packard were each an "employer" of Kim as defined in the IMWL. 820 ILCS 105/3(c), and StoneX became Kim's "employer" under the IMWL after the Acquisition.

109. At all relevant times herein, Kim was an "employee" within the meaning of the IMWL.

110. Kim was not exempt from the requirements of the IMWL.

111. Kim was damaged by these IMWL violations by the defendants, including without limitation because it delayed his receipt of his rightfully earned wages.

### COUNT IV
### VIOLATION OF THE FAIR LABOR STANDARDS ACT
### (29 U.S.C. § 201 et seq.)
### AGAINST ALL DEFENDANTS

112. Plaintiff realleges and incorporates by reference paragraphs 1-77 above.

113. The FLSA defines employer broadly to include "any person acting directly of indirectly in the interest of an employer in relation to an employee . . ." 29 U.S.C. § 203(d).

114. Global, StoneX, Packard and Swanson, at all times relevant hereto, were subject to the wage requirements of the FLSA because they were employers engaged in interstate commerce as per 29 U.S.C. §203(d).

115. At all relevant times hereto, Swanson and Packard possessed day-to-day authority over Plaintiff's and other employees' terms and conditions of employment, including without limitation the authority to hire and fire, make pay decisions, and otherwise control Kim's work conditions.

116. Global, StoneX, Packard and Swanson willfully violated the FLSA when they failed and refused to pay compensation to Kim when due, instead subjecting him to one or more automatic payroll deductions, and continued to wrongfully withhold portions of his earnings for years after such earnings were due and owing to Kim.

117. Swanson and Packard are individually liable under the FLSA for Global's violations, including without limitation, because they established and/or were responsible for enforcing Global's employment policies, including the company's pay policies and compliance with applicable state and federal law; Swanson and Packard exercised control over Kim's work; Swanson and Packard each played an important role in making personnel decisions for Global and had the authority to hire and fire employees; Swanson exercised day-to-day control of operations for Global; Swanson and Packard had control and influence over Kim's assignment to account(s), and Swanson and Packard exercised such control.

**COUNT V**
**VIOLATION OF THE FAIR LABOR STANDARDS ACT**
**RETALIATION (PLEADING IN THE ALTERNATIVE)**
**(29 U.S.C. § 201 *et seq.*)**
**AGAINST ALL DEFENDANTS**

118. Plaintiff realleges and incorporates by reference paragraphs 1-77 above.

119. Pleading in the alternative, the FLSA defines employer broadly to include "any person acting directly of indirectly in the interest of an employer in relation to an employee . . ." 29 U.S.C. § 203(d).

120. Global, StoneX, Packard and Swanson, at all times relevant hereto, were subject to the wage requirements of the FLSA because they were employers engaged in interstate commerce as per 29 U.S.C. §203(d).

121. At all relevant times hereto, Swanson and Packard possessed day-to-day authority over Plaintiff's and other employees' terms and conditions of employment, including without limitation the authority to hire and fire, make pay decisions, and otherwise control Kim's work conditions.

122. Global, StoneX, Packard and Swanson willfully violated the FLSA when they failed and refused to pay compensation to Kim when due, instead subjecting him to one or more automatic payroll deductions, and continued to wrongfully withhold portions of his earnings for years after such earnings were due and owing to Kim.

123. After Kim engaged in statutorily protected activity by complaining about the Wrongful Withholdings, Global, StoneX, Packard and Swanson retaliated against Kim, including by continuing to withhold earned compensation from Kim for over two (2) years despite objections from Kim, and by ultimately terminating Kim's employment.

124. Swanson and Packard are individually liable under the FLSA for Global's violations, including without limitation, because they established and/or were responsible for enforcing Global's employment policies, including the company's pay policies and compliance with applicable state and federal law; Swanson and Packard exercised control over Kim's work; Swanson and Packard each played an important role in making personnel decisions for Global and had the authority to hire and fire employees; Swanson exercised day-to-day control of operations for Global; Swanson and Packard had control and influence over Kim's assignment to account(s), and Swanson and Packard exercised such control.

**WHEREFORE**, Plaintiff prays that the Court enter judgment in his favor and against Defendants Global, StoneX, Packard and Swanson, jointly and severally, as follows:

A. Declare Defendants' conduct to violate the rights guaranteed to Plaintiff under the FLSA, the IMWL and Title VII;

B. Grant a permanent injunction restraining Global and StoneX, and each of its officers and employees and all persons in active concert or participation with said defendant, from engaging in any employment practice which unlawfully discriminates on the basis race, national origin, or ethnicity;

C. Award Kim compensatory damages, including unpaid wages, interest at a rate of 2% of the underpayment per month under the IMWL;

D. Order Defendants to make Plaintiff whole by providing the affirmative relief necessary to eradicate the effects of Defendants' unlawful practices;

E. Grant Plaintiff consequential, compensatory, nominal, and any other damages, including backpay, additional backpay to account for the negative tax consequences of a lump-sum payment and damages for emotional pain, distress, and suffering and mental anguish, in an amount to be determined at trial, against Defendants;

F. Grant Plaintiff punitive damages against Defendants;

G. Grant Plaintiff such equitable and injunctive relief that the Court may deem appropriate;

H. Grant Plaintiff his attorneys' fees, costs, pre-judgment and post-judgment interest and disbursements pursuant to Title VII, the IMWL and the FLSA;

I. Award Plaintiff back pay damages (including overtime compensation and unpaid wages) equal to the amount of all unpaid wages for the three (3) years preceding the filing of this Complaint (according to the applicable statute of limitations for willful violations of the FLSA);

  J. Award Plaintiff liquidated damages in an amount equal to the amount of unpaid compensation found due pursuant to 29 U.S.C. §216(b)

  K. Award Plaintiff prejudgment interest in an amount equal to the amount of unpaid compensation;

  L. Grant Plaintiff injunctive relief precluding all defendants from further FLSA and IMWL violations; and

  M. Grant Plaintiff such further relief as the Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

125. Plaintiff demands trial by jury on all counts and issues so triable.

            Respectfully Submitted,

            /s/ Stacey Vucko
            STACEY VUCKO
            One of Plaintiff's Attorneys

Dated: May 6, 2022

STACEY B. VUCKO
JOSEPH W. VUCKO
VUCKO LAW LLP
2208 Midwest Rd., Suite 104
Oak Brook, IL 60523
312-522-2517
svucko@vuckolaw.com